Filed 7/15/16  P. v. Gaines CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ERIC GAINES ,<br><br>        Defendant and Appellant. | A 136979<br><br>(Alameda County<br>Super. Ct. No. 167692) |

A jury convicted defendant Eric Gaines of one count of murder (Pen. Code,[1] § 187, subd.(a)) and two counts of being a felon in possession of a firearm (former § 12021, subd. (a)(1)).  The jury also found defendant personally used a firearm, causing great bodily injury or death (§§ 12022.53, subd. (d), 12022.7, subd. (a).)  The jury, however, acquitted defendant of a second murder count and special circumstances allegation (§§ 187, subd. (a); 190.2, subd. (a)(3)), related firearm possession count (former § 12021, subd. (a)(1)), and enhancement (§ 12022.53, subd. (d)).  The trial court sentenced defendant to a determinate term of two years and eight months for the felon in possession counts.  An indeterminate term of 75 years to life, consisting of 25 years to life on the murder count, doubled pursuant to section 1170.12, subdivision, (c)(1), plus a consecutive 25 years to life term was imposed.  On appeal, defendant contends reversal is required due to evidentiary and instructional errors, as well as prosecutorial misconduct. We affirm.

---

[1]     All further undesignated statutory references are to the Penal Code.

# I. EVIDENCE AT TRIAL

## A. *Murders of Warren Ingram and Thomas Cousey*

### 1. *Testimony of Portia Phifer*

In April 2009, Portia Phifer, lived with her cousin Thomas Cousey in the 1700 block of 84th Avenue in East Oakland. Phifer and Cousey had grown up in this general area, along with Warren Ingram, Deandrey Moore, J.C. "Big Ju" Foster, and Robert Green. Defendant had not grown up with the group, but he and Cousey were best friends. On the evening of April 6, 2009, Cousey introduced Phifer to defendant, who went by the name "E." At the time, Moore, Cousey, Ingram, Turner, and defendant "were on 84th chilling, drinking[,] getting high, talking about old times." Phifer and Moore's girlfriend, Miracle Turner, were also sitting in a car, "doing the same thing." At some point, defendant left. After some more drinking, Ingram left in his car. When Ingram returned, he was upset with Moore and "cussing [him] out." Ingram got back in the car with Moore, and Cousey joined them. Phifer told Cousey not to leave, but he left saying he would "be right back."

About 10 or 15 minutes later, the car returned with Cousey driving. Moore was not in the car; Ingram was "laid out in the backseat." Cousey jumped onto the hood of the car, screaming for Phifer and saying, "He hit. He hit. He hit." Phifer and Turner ran to the car, and Phifer jumped in the driver's seat. As Phifer drove to the hospital, Cousey turned around and hit Ingram to wake him up. When Cousey turned back around, he accidentally "slammed the gear out of drive into park" and the car stalled. Phifer got out and flagged down cars until an ambulance arrived and took Ingram away. The police came, put Phifer in a police car, and took her to "the homicide room." Cousey was also taken there. After Cousey and Phifer were released by police, they walked home because Cousey did not want to call anyone for a ride.[2]

---

[2] Phifer acknowledged that she did not want to testify in this case. She had been threatened. She said, "The word was already sent out don't come to court." She was told that if she came to court, she could no longer go to her grandmother's house on 84th.

When Cousey and Phifer returned to 84th Avenue, they set up a memorial for Ingram. Cousey was on the telephone talking to Moore when Phifer heard "a lot of shots" and "took off running." When the shots stopped, Phifer retuned to the area and saw Cousey "laying on the ground" dead. Phifer did not see who shot him.

2.      *Testimony of Deandrey Moore*

Deandrey Moore grew up with Cousey in the 84th Avenue neighborhood. Moore met Ingram around 2001 and they hung out "every now and then." In April 2009, Moore was "on the run," "[a]bscounding parole." He had three felony convictions that were related to cocaine sales.

Due to Moore's incarceration, the night of April 6, 2009 was the first time Moore had gotten a chance to hang out with Cousey in a while. Moore denied that he knew defendant. Moore had heard of defendant and knew that his nickname was "Little E." Moore claimed he had never seen defendant before coming to court to testify in this case.

The night that Ingram was killed, Moore went to the area of 84th and Plymouth around 8:00 or 9:00 p.m. Ingram flagged him down and Moore pulled over. Moore smoked and "chilled" with Ingram and another person for "a minute." The other person left and Moore and Ingram continued smoking. About 5 or 10 minutes later, Cousey joined them.

Moore testified he did not remember who the other person was, but acknowledged that he told police it was "Little E or Eric." Moore did not know why he said the other person was defendant. He thought he did it out of "fear" because people were calling him and saying that he (Moore) had killed Cousey. Moore said he was in Hayward when Cousey was killed.

Moore explained that he left the area around 11:30 p.m. on April 6 because he saw a police car. Moore denied he was on Plymouth and 84th at 1:00 a.m. on April 7. He

_____

Phifer understood that statement to mean she "was going to be dead." She did not know who made the threats. She understood that the snitch label meant "snitches get stitches" and that a person would be killed if they told on someone. This was the reason why Phifer did not want to cooperate with the police.

also denied that he saw any guns that night. At some point, Ingram had left; Moore was not there when Ingram returned. Moore denied that Ingram asked him to go get his (Ingram's) gun when he returned. He further denied telling Ingram that Little E took the gun. Moore denied that he got in a car with Ingram and rode from 84th and Plymouth to 85th where the mini-park was located. In fact, Moore denied going anywhere with Cousey and Ingram. Moore said he was not in the mini park when Ingram was killed and he did not see defendant. Moore repeated that he was not in the mini-park and, for that reason, denied that he 1) heard any shots there, 2) saw anyone shooting there, 3) saw a Mercedes parked in front of the mini park, 4) saw a van in front of the Mercedes, and 4) helped Cousey put Ingram's body in a car. Rather, Moore claimed he was in Hayward at the Crown Lodge when Ingram was killed. However, he admitted he told police that he was in the area when Ingram was shot.

Moore acknowledged that he picked defendant's photograph from a lineup and told police that he was the person who shot Ingram. Moore, however, said that he had never seen defendant before he looked at the photographic lineup. According to Moore, it was just a random pick because he was not in his "right state of mind" and "went in a panic mode." Moore had panicked because he had received telephone calls saying that he told Cousey to come to the corner where he was murdered. Moore said that Cousey called him on Turner's phone, but they did not get a chance to have a conversation. The only thing Cousey said was, "Shit, it's crazy, man," and, according to Moore, "that's when all hell broke loose." Moore heard "some gunshots in the background" and then the phone went dead. Moore called back and a woman said Cousey was dead.

Moore admitted that during an interview with police on June 4, 2009, he said, "I sat up here and snitched, and I'm not getting out of custody." Moore claimed he was not worried about being labeled a snitch. He said he lied to police because he was concerned about a parole violation and what was being said about him on the street. Moore said he lied when he told police that defendant killed Ingram. Moore also claimed he lied when he said that Ingram and defendant each had a gun. Moore said he lied when he told police that he would have shot defendant if he had had a gun. He further denied he told

police that he helped put Ingram in the car. But, he admitted he told police he ran when he heard defendant shoot Ingram. A compact disc of Moore's June 4, 2009 interview with police was played for the jury as a prior inconsistent statement.[3] Moore said that the facts he related to police about the Ingram crime scene, which were consistent with the physical evidence, were fabricated to make his story sound good. For example, Moore told police that defendant used a .357 revolver to shoot Ingram and that defendant had retrieved it from the front of a van's tire. Moore said the first fact was a guess and the second was made up "to make it sound good."

Moore denied that, around 2:00 a.m. on April 8, 2009, he went to J.C., "Big Ju," Foster's house and told him Ingram had been shot or anything else about the incident. Moore also denied he called Ingram's family after the shooting and told them what happened.

On cross-examination, Moore testified that at some point on the morning of April 7, 2009, Ingram was upset that he could not find his gun and got "pissed off" at Moore and Cousey. Ingram got in Moore's face, and Moore, trying to maintain his reputation, told Ingram to "hold up" and to not come at him like that. Moore denied that Ingram made him and Cousey get in his car to go look for the missing gun. Moore further denied that Ingram got in his face again about the gun and that he responded to that disrespect by shooting Ingram. On redirect examination, Moore denied that he killed Ingram or Cousey.

### 3. Testimony of J.C. Foster

J.C. Foster was unavailable as a witness and his preliminary hearing testimony was read into the record. Foster had lived at 84th and Olive in East Oakland. Over time, Foster became close to Moore, who also lived in the neighborhood. Moore was also called "D-Mo" and "Drey." Foster had known Moore over 15 years and they were "[r]eal close." Foster was about 10 years older than Moore. Moore was like a little brother to Foster, and Moore viewed Foster as an older brother. Foster's relationship with Cousey

---

[3]     We have listened to the compact disc recording.

was similar to the one he had with Moore. Foster had also known Phifer from the neighborhood for about 15 years and Ingram for about 10 years. Foster had seen Cousey, Moore and Ingram hanging out together. Foster knew defendant as "E." He had known defendant for over five years. Defendant was from a different neighborhood, and Foster only knew him enough to exchange pleasantries or share a smoke or a drink. It would also not have been unusual for Cousey, Ingram or Moore to have a drink or cigarette with defendant.

Foster believed he first heard about Ingram's death from Moore who said, "[M]an, we lost another one, man. He gone, man. It's over, man. I got to talk to you, you know." At the time, Foster was still grieving the death of his younger brother Myron, who was killed a year or two before Ingram. Moore told Foster he was present when Ingram was killed. Foster believed Moore said Cousey was also present. Moore told Foster that Ingram was killed over a gun. Moore said Ingram was upset because a gun was stolen. Moore told Foster that "E," killed Ingram, but Foster claimed he did not know which "E" Moore was talking about. Foster denied he picked defendant out of a photographic lineup when he talked with police in August 2009. Foster claimed he was never shown defendant's picture. However, when shown the photographic lineup, Foster said he had identified the person in position number 5 as "E," and this person was the one Moore said shot and killed Ingram. Excerpts from the video recording of Foster's August 2, 2009 interview with Sergeants Rachel Van Sloten and Tony Jones were played for the jury.[4] According to Foster, Moore told him during telephone phone conversation that "E" had killed Ingram with a revolver.

4.    *Testimony of Anthony Scott*

In April 2009, Anthony Scott lived in Oakland, but at the time of trial he was living in Georgia. Scott did not know Moore, Phifer, Cousey, Foster, or anyone associated with this case. Scott did not know defendant personally, but had seen him

---

[4]    We have reviewed the recorded excerpts included in the record on appeal.

once or twice before April 7 and identified him in court. He had known defendant by his nickname, which he could not recall at trial.

In April 2009, Scott had been driving a burgundy Mercedes. In the early morning hours of April 7, Scott had been drinking and planned to meet up with a woman in the mini-park on 85th and Plymouth. While he was waiting for the woman, Scott got out of the Mercedes to use the bathroom. He noticed some people "scattered around" the park. Scott claimed he did not remember anything about that morning after he used the bathroom. He left the park on foot but was too drunk to remember why he did so. He did recall that he dropped two cell phones in the park.

Scott called the police the next day to retrieve the Mercedes he left in the mini-park. He was interviewed by Oakland Police officers, including Sergeant Rachel Van Sloten. Scott was also interviewed by police on July 30, 2009. In 2011, Scott was in custody in Georgia on a driving under the influence offense. At some point, Scott learned that Oakland Police had been inquiring about him. So, Scott called Sergeant Van Sloten to find out why she was looking for him. Van Sloten and another officer traveled to Georgia to talk with Scott on September 1. Scott claimed he did not recall discussing the specifics of the incident during that interview. He did not remember telling police that: 1) defendant was standing behind the black gate at the apartment building when Scott got out of the Mercedes; 2) a car pulled up and parked behind the Mercedes while he was in the park; 3) two people got out of the car and one person asked, "[W]here is my gun[?]" ; 4) defendant was the only person standing by the black gate, which is where the shots came from; 5) the person who was shot was the one who got out of the car talking about a gun; and 6) Scott ran from the park when he heard the gunshots. Scott did not recall a diagram of the scene he made during the September 1 interview. A video recording of the interview was played for the jury.[5] Even after identifying himself on the video recording, Scott claimed he was not actually watching the DVD and continued to maintain that he did not recall making the diagram or what he said during the interview.

---

[5]     We have reviewed the video recording that has been included in the record on appeal.

He did not remember telling the police that Little E, defendant's nickname, shot the victim on April 7, 2009. Scott acknowledged that the transcript of the DVD, which he said he was reading while the DVD was playing, indicated he identified defendant as the shooter.

### 5. *Testimony of Robert Green*

Robert Green admitted that he was not interested in testifying in this case. He claimed that when he was caught with a stolen car, he lied to police so he could get out of jail. According to Green, the homicide officers who brought him to the station told him that they would not let him go unless he said something about defendant's involvement in a shooting. Green said he made up a good story and told it to police. During his August 20, 2010 interview, Green told police that defendant shot Cousey because Green and defendant were "caught together" on June 3, 2010, and Green "didn't have nobody else to think of at the time." Green was not in the area when Cousey was shot. Green denied that, during the day on April 7, 2009, he spoke with defendant or that defendant expressed concern about Phifer and Cousey being at the police department, talking with police, or that defendant said he was looking for Cousey. Green admitted he told police he had the conversation with defendant, but claimed he was merely telling the police what they wanted to hear. A video recording of Green's interview with police on August 29, 2010 was played for the jury.[6] Green was nervous during the interview because he did not want anyone in the neighborhood to know he talked with police. He was concerned about getting shot again or being beaten up in retaliation for cooperating with police. After viewing the video recording, Green acknowledged that the police did not tell him what to say. Rather, he claimed he had already thought of what to say before the interview.

## B. Police Investigation

Oakland Police Officer Joe Fesmire described the area of 85th and Plymouth as a high crime area where he had responded "[n]umerous" times to "shootings and robberies

---

[6]     We have reviewed the video recording included in the record on appeal.

and reports of drug dealing . . . ." Around 10:00 p.m. on April 6, 2009, Fesmire was on patrol in front of the mini park in the 1700 block of 85th Avenue. Fesmire saw defendant, Durant Riley and Marla Jamison, also known as Carla Watts, drinking in front of a car. He approached them and noticed that they all smelled like marijuana. Defendant said he was on parole and Fesmire conducted a parole search. Jamison/Watts had a $20,000 warrant for domestic battery and was arrested. Fesmire warned the others about loitering in the park after 10:00 p.m. and drinking in public. Fesmire was familiar with the mini park and knew it was used for drug dealing.

Jason Dunham, a software engineer with SST Incorporated, formerly known as Shot Spotter Incorporated, testified that his company sold and maintained a network of acoustic sensors that detected gunshots in Oakland. The sensors would send any sounds of gunshots to a computer that would calculate the location of the shot. On request, Dunham authenticated a forensic report that his company generated concerning the shooting incident. The report consisted of audio files on a compact disc and "paper documents." The data on the files concerned April 7, 2009 at 1:17 a.m. The report indicated that there were two shots which were fired seven seconds apart and within 10 feet of each other near 1722 85th Avenue next to the mini park.

Around 1:15 a.m., on April 7, 2009, Oakland Police Officer Ny Nguyen and his partner, Officer Smith, were dispatched to 85th Avenue "to check a shots spotter activity" that indicated two shots had been fired. Nguyen explained that a shot spotter was a device that picked up shots when guns were fired in an area. Nguyen went to the 1700 block of 85th Avenue where he saw a white baseball cap near a small pool of what appeared to be fresh blood that was behind a maroon Mercedes. It appeared that someone had been shot, but Nguyen did not find anyone at the scene.

At approximately 1:30 a.m. on April 7, 2009, Oakland Police Officer Hector Chavez responded to a report of a shooting at the intersection of Hillmont and Sunkist Avenue. There he saw emergency vehicles and personnel, along with several deputies. A 1996 maroon Nissan Maxima was blocking traffic. The shooting victim, Warren Ingram, had been on the right passenger side of the Maxima when Chavez first arrived.

Ingram was bleeding from the head and chest. Chavez spoke with two civilian witnesses, Thomas Cousey and Portia Phifer, who were taken by other officers to the homicide department at the police station.

Around 10:00 p.m. on April 7, 2009, Oakland Police Officer Kyle Hay went to the 8300 block of Plymouth to investigate reports of gunshots. Hay described the location, which was near 84th and Plymouth, as a residential, high crime area. Witnesses to crimes were typically uncooperative because they lived in the area and talking to the police was not "looked well upon cuz' you know it's us versus them mentality."

When Hay arrived at Plymouth, he saw Cousey, whose body was soon covered with a tarp, on the curb next to 1701 84th Avenue. Another officer had attempted to render aid to Cousey while a couple of people stood around him "screaming and yelling." Hay saw several casings and slugs in the street.

## C.    *Defense*

Defendant did not present any evidence at trial.

## II. DISCUSSION

### A.    *Testimony of Unavailable Witness*

Defendant contends that the admission of Foster's preliminary hearing testimony violated his constitutional right of confrontation. Defendant claims that the prosecution failed to meet its burden of due diligence to obtain Foster's presence at trial and thus failed to demonstrate Foster's unavailability.

#### 1.    *Background*

On November 14 and 15, 2011, J.C. Foster testified at the preliminary hearing. On August 13, 2012, the prosecution filed points and authorities in support of a motion to introduce the preliminary hearing testimony of J.C. Foster on the ground that he was unavailable as a witness. A report by District Attorney's Inspector Jeff Jouanicot, summarizing the efforts to locate Foster, was attached to the points and authorities. That same day, Jouanicot testified at a due diligence hearing regarding his attempts to locate Foster. Jouanicot said that sometime during the first week of June of 2012, the prosecutor asked him to locate and serve several witnesses, including J.C. Foster. At

some point, Jouanicot asked the prosecutor to draft three material witness warrants. Jouanicot started his search for Foster by looking at "typical databases," such as "the sheriffs department's booking, Department of Justice, CI&I, Oakland Police Department records systems, other police department's records" and "some Internet databases" were available. Jouanicot determined that Foster had been on parole and contacted his parole agent who advised him that Foster was no longer on parole and gave him "the last known addresses and phone numbers and information" for Foster. During the week of June 11, Jouanicot went to the last known address, spoke with the manager of the apartment complex and learned that neither Foster nor his friends and family lived there.

During the week of June 18th, Jouanicot spoke with a young man who insisted he did not know Foster, but, based on the information Jouanicot had, the location "would have been a valid address for him." At that point, Jouanicot contacted Oakland police officers who were familiar with Foster and "elicited their help in trying to locate him." Jouanicot gave the officers copies of the subpoena to serve Foster if they came across him. One of the officers who was familiar with Foster said he had seen Foster in the neighborhood "up until about that time" on a regular basis, but he no longer saw Foster on the streets.

In the week of June 26th, Jouanicot spoke with Officer Curtis Filbert, gave him a copy of the subpoena and asked him "to pass that information out to the Oakland officers working in that area." Officer Filbert had indicated that he was familiar with both the area and Foster. Jouanicot and Filbert had met in that area, which was Filbert's assigned beat. On July 3, Filbert called Jouanicot and told him he had spoken with Foster's wife at the last address Jouanicot had visited. Foster's wife said he had been shot at, was "scared for his life," and was "hiding out." Jouanicot asked Filbert to continue to try to locate Foster and gave him updated subpoenas.

During the weeks of July 30th and August 6th, Jouanicot returned to Foster's last known address on 5311 Belvedere Street in Oakland, "knocked on the door a couple more times" and went down the street a few times hoping to see someone.

Unfortunately, Jouanicot still was not able to make contact personally with Foster on any of those occasions.

Jouanicot followed up with the Oakland Police officers he had previously spoken to about Foster. He did a follow-up as recently as the week before his testimony. He also did follow-up by checking the databases, as recently as the morning of his testimony, but he did not find anything new.

Jouanicot testified he had not been able to make contact with Foster to serve him with a subpoena. Based on what he knew, Jouanicot believed Foster was "avoiding law enforcement" because he knew that they wanted to serve him with a subpoena. Jouanicot was sure Foster's wife had given him the message, but he appeared to be trying to avoid them. Other witnesses in this case had been similarly trying to avoid service of subpoenas.

On cross-examination, Jouanicot testified he did not write down the specific dates and times he personally attempted to locate Foster. Jouanicot personally tried to serve Foster six times, mostly early in the morning, between 8:00 a.m. and 10:00 a.m., but sometimes later in the day, probably mid afternoons. Jouanicot did not contact Foster's mother or anyone else in his family other than his wife.

Jouanicot noted that he had seen other addresses listed for Foster before the 5311 Belvedere Street address. However, Jouanicot assumed that because Foster's wife lived at the Belvedere address and it had been given as the forwarding address for Foster just a few months earlier, that this was his current address. Jouanicot checked "EDD" for Foster's employment history and found nothing.

Following Jouanicot testimony, the prosecutor argued that due diligence had been shown. He emphasized that "the standard is exercise reasonable diligence, not exhaust every means." He noted that he had questioned Jouanicot about other witnesses in the case and that three material witness warrants had been issued. The prosecutor had indicated in prior pleadings that "no material witness warrant was sought for Mr. Foster because there was no basis because he actually showed up for the preliminary hearing as was ordered." The prosecutor argued that, in determining "whether or not reasonable

efforts were exercised," the trial court "should take into consideration in that process this investigator's overall duties as it relates to the other witnesses as well."

Defense counsel argued that "the standard" did not include consideration of "whether or not the inspector was busy, whether or not other people had difficult jobs." He said due diligence required that the investigator make more than six attempts to contact the person and that a surveillance be conducted. Counsel asserted, "They have to exhaust just about every possible means in order to come into court and ask that a person read in testimony." He acknowledged that he could not cite a case to support his position, but claimed he was familiar with the area based on practicing law for 20 years. He argued that there should have been "a log so the court can make a record." He also argued that if the prosecution wanted to show due diligence, there should have been a log showing that every day of the previous week, in the evening and on the weekend someone went to Foster's address to see if he was there. Defense counsel argued that the burden of showing due diligence had not been met.

The prosecutor observed that "the code itself" referred to "reasonable diligence." He noted that defense counsel could "cite no cases as it relates to his specific proposition that essentially everything must be done." Referring to that proposition, the prosecutor said, "That's not the state of the case law as it relates to evaluating the unavailability and whether or not reasonable diligence has been exercised."

The trial court admitted Foster's preliminary hearing testimony, stating: "The Court has heard the testimony of Inspector Jouanicot, and it appears that he has done many things to try to seek the appearance of J.C. Foster. [¶] From the first week in June until now, he's gone out or he's tried to make contact with the parole officers, the wife, other people who lived at the place of last known address. He's attempted to have the police officer familiar with Mr. Foster locate him out there. And I don't know what else he could have done other than to maintain an around-the-clock surveillance of that home which comes beyond reasonable diligence. [¶] So the Court will find that Inspector Jouanicot exercised due diligence to locate and serve J.C. Foster. And pursuant to Evidence Code section I think that's 1290, his preliminary hearing testimony, since it was

under oath and [defense counsel] did, in fact, have an opportunity to cross-examine him at that time, may be used.  Mr. J.C. Foster's declared an unavailable witness."

Thereafter, Foster's preliminary hearing testimony was read into the record.

2.        *Analysis*

Under the state and federal Constitutions, a criminal defendant has the right to confront the prosecution's witnesses.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *People v. Herrera* (2010) 49 Cal.4th 613, 620 (*Herrera*).)  "Although important, the constitutional right of confrontation is not absolute.  [Citations.]"  (*Id.* at p. 621; accord, *People v. Thomas* (2011) 51 Cal.4th 449, 499.)  An exception exists when a witness is unavailable, the witness testified against the defendant at a prior proceeding, and the witness was subjected to cross-examination.  (Evid.Code, § 1291, subd. (a)(2); *Herrera, supra,* 49 Cal.4th at p. 621.)

A witness is unavailable if the prosecution "has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."  (Evid.Code, § 240, subd. (a)(5).)  Due diligence " ' "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character." ' "  (*Herrera, supra,* 49 Cal.4th at p. 622; See *People v. Valencia* (2008) 43 Cal.4th 268, 292 (*Valencia*).)  "Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.'  [Citation.]"  (*Herrera, supra,* at p. 622; *Valencia, supra,* at p. 292.)  As long as " 'substantial good faith' " efforts are undertaken to locate a witness, the fact that " 'additional efforts might have been made or other lines of inquiry pursued' " does not indicate lack of diligence because " '[t]he law requires only reasonable efforts, not prescient perfection.'  [Citation.]"  (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.)

On appeal, "[w]e review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard [citation], and independently review whether the facts demonstrate prosecutorial good faith and due diligence [citation]." (*Herrera, supra,* 49 Cal.4th at p. 623.)

"A witness who is absent from a trial is not 'unavailable' in the constitutional sense unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial. [Citation.] The United States Supreme Court has described the good faith requirement this way: 'The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness. [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." ' [Citation.]" (*Herrera, supra,* 49 Cal.4th at p. 622.)

This good faith obligation is reflected in the language of Evidence Code section 240, subdivision (a)(5), which states that a witness is unavailable when he or she is " '[a]bsent from the hearing and the proponent of his or her statement has exercised *reasonable diligence* but has been unable to procure his or her attendance by the court's process.' (Italics added.) The term '[r]easonable diligence, often called "due diligence" in case law, " 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " ' [Citations.]" (*Herrera, supra,* 49 Cal.4th at p. 622.) The due diligence requirement imposed by California law is essentially the same as the federal constitutional good faith requirement. (*Ibid*.)

Defendant contends the evidence summarized above does not support the trial court's finding that Foster was unavailable because the prosecution failed to establish that it exercised due diligence to secure Foster's attendance at trial. "[D]iligence has been found when the prosecution's efforts are timely, reasonably extensive and carried out over a reasonable period. [Citations.]" (*People v. Bunyard* (2009) 45 Cal.4th 836, 856 (*Bunyard*).) In contrast, diligence has found to be lacking where the prosecution's efforts were "perfunctory or obviously negligent. [Citations.]" (*Id.* at p. 855.)

Here, rather than focusing on the prosecutor's efforts, or lack thereof, defendant devotes the majority of his argument advancing his position that Moore was "Ingram's killer" and "at least implicated in the murder of . . . Cousey." For this reason, defendant asserts that Foster's testimony was crucial insofar as Moore's "credibility included the question of his third-party culpability."

Nevertheless, defendant briefly addresses the reasonableness of the prosecution's search for Foster, asserting that the prosecution's "proof of diligence fell far short" of what was constitutionally required in this case. Defendant faults the investigator for only knocking on a few doors, failing to keep a log, failing to set up surveillance of Foster's last known address, and limiting the attempts to the hours of 8:00 a.m. and 10:00 a.m. Defendant asserts that other than theses limited attempts, the investigator "surrendered his duties to the Oakland police." He also faults the prosecution for failing to produce any Oakland police officers to testify regarding the efforts to locate Foster. Thus, according to defendant, "[i]n light of the importance of Foster as a witness," the prosecution's efforts cannot be reasonably deemed to constitute due diligence. We disagree.

Contrary to defendant's suggestion, "[t]he prosecution is not required 'to keep "periodic tabs" on every material witness in a criminal case . . . .' [Citation.] Also, the prosecution is not required, absent knowledge of a 'substantive risk that this important witness would flee,' to 'take adequate preventative measures' to stop the witness from disappearing." (*People v. Wilson* (2005) 36 Cal.4th 309, 342.) Here, Foster appeared without incident at the preliminary hearing. Then, sometime prior to trial, Foster got scared and went into hiding. The investigator explored various avenues in attempting to locate him; checking in with Foster's parole officer; making numerous visits to Foster's last known residence and other residences; checking multiple statewide databases for Foster; contacting his wife; and reaching out to the Oakland Police Department. Exercising our independent review, we conclude the prosecution's efforts to produce Foster for trial were reasonable under the circumstances. (See *People v. Wilson, supra,* 36 Cal.4th at p. 342.) That the investigator failed to keep a log of his efforts or that he

limited his attempts to locate Foster to morning hours, does not transform this otherwise thorough effort into an unreasonable one, lacking the requisite diligence.  The situation here is the same as repeatedly confronted by our Supreme Court: "[D]efendant has suggested other things the prosecution might have done.  But these suggestions do 'not change our conclusion that the prosecution exercised reasonable diligence.  "That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion.  [Citation.]  It is enough that the People used reasonable efforts to locate the witness." ' " (*Valencia, supra,* 43 Cal.4th at p. 293, quoting *People v. Wilson, supra,* 36 Cal.4th at p. 342.)

Accordingly, we conclude that the prosecution satisfied its good faith obligation and exercised reasonable diligence to secure Foster's attendance at trial.

To the extent defendant maintains that Foster's testimony was needed to either rehabilitate Moore's credibility or cast doubt on it, his interests and motives in cross-examining Foster were sufficiently similar to those existing at trial, that is, to raise a reasonable doubt as to Moore's involvement in the murders of Ingram and Cousey. Accordingly, we conclude there was no violation of defendant's constitutional rights.

**B.     CALCRIM No. 317**

Defendant next contends that CALCRIM No. 317, which instructed the jury to view prior recorded testimony by the same standards as live testimony, was constitutionally defective.  According to defendant, the instruction, as given, violated his right to confrontation.

The jury was instructed with CALCRIM No. 317 as follows:  "The testimony that J.C. Foster has given under oath was read to you because he is not available.  You must evaluate his testimony by the same standards that you apply to a witness who testified here in court."  According to defendant, CALCRIM No. 317 "should have been formulated as a cautionary instruction, admonishing the jurors why and in what way prior testimony is not the optimal evidence and why there are pitfalls in trying to assess credibility from a 'cold record.' " (Italics omitted.)  We disagree.

Despite defendant's contrary contention, CALCRIM No. 317 is a correct statement of law. There is no support for defendant's contention that CALCRIM No. 317 infringes upon his right to confrontation. Rather, the instruction merely advises the jury to view the testimony of an unavailable witness by the same standards as witnesses who have appeared in court.

We are not persuaded by defendant's alternate attack on the admission of Foster's preliminary hearing testimony. As discussed, the prosecution exercised due diligence in attempting to secure Foster's attendance at trial. Moreover, the same attorney who represented defendant at trial appeared with him at the preliminary hearing, and, as the trial court noted, had the opportunity to cross-examine Foster. Accordingly, there was no confrontation clause violation. (*California v. Green* (1970) 399 U.S. 149, 160-161; *People v. Chavez* (1980) 26 Cal.3d 334, 360-361.)

In determining the impact of the instruction, it is not viewed in isolation, and must be viewed with other instructions. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016.) When viewed in this context, CALCRIM No. 317 does not give any advantage to Foster's testimony because he was unavailable at trial. The jury was instructed to evaluate Foster's testimony by the same standards that it would apply to a witness who testified at trial. Nothing in the instructions suggests the jury should give any special deference to Foster's preliminary hearing testimony.

## C.     *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct during closing argument insofar as he argued that Foster's prior inconsistent statement could be used for the truth of the matter asserted, rather than for the limited issue of credibility.

Defendant, however, does not set forth the particular language he finds objectionable. Rather, without citation to the record, defendant suggests that the prosecutor capitalized on a discrepancy between Foster's statement to the police and his testimony at the preliminary hearing.

It is not the duty of this court to find support in the record for an appellant's claims. (Cal. Rules of Court, rules 8.204(a)(1)(C), 8.360(a).) Rather, it is the duty of

defendant's counsel to justify reversing the jury's decision on that point by citing relevant authority and discussing how that authority applies to the evidence on the record. Appellant's counsel has failed to perform the second step of that process. (See *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1245, fn. 14 ["[H]e did not make this argument on appeal in any adequate fashion (i.e., presentation of cogent argument with specific citations to the record); we therefore deem such argument . . .to have been waived"]; see *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115 ["he cites only general legal principles without relating them to any specific facts or admissible evidence. As a general rule, 'The reviewing court is not required to make an independent, unassisted study of the record in search of error . . . .' "].) Nevertheless, in the interest of justice we disregard the noncompliance and address the argument on its merits and conclude it fails. (See Cal. Rules of Court, rules 8.204(e)(2), 8.360(a).)

It appears that challenged remarks by the prosecutor were in relation to the testimony of Foster and Moore: "So as to Mr. Moore, not only do you have corroboration with Portia Phifer as to the events leading up to the shooting, but after that shooting, J.C. Foster gave a taped statement and he gave a taped statement stating that Deandrey Moore, the very same Deandrey Moore that you saw on the stand, came to his house at roughly two a.m. on April 7th, 2009. So after Warren [Ingram] had been shot, we're talking within an hour, he woke him up. [¶] And as J.C. Foster said on that taped statement, he had been smoking marijuana earlier and so he essentially dozed out. And this is two o'clock in the morning and he was asleep. And he was awakened by a loud knock at his door. And the person knocking at his door was Deandrey Moore. [¶] And Deandrey Moore at that time, and this is months before Deandrey Moore had talked to the police, months before Deandrey Moore wanted to get out of custody, this is the same exact day almost immediately after Warren had been murdered, he's at the front door of J.C. Foster telling him, 'Hey, Warren just got shot. Little E did it.' [¶] And unequivocally, J.C. Foster knew Little E. He grew up with all these folks. He was very close to Deandrey Moore, knew Thomas Cousey. As he said, he used to take him back and forth to basketball practice. [¶] So when he was told Little E, there was no question

in his mind Little E was the person he knows as Eric Gaines, the defendant. And he picked him out in terms of a photo lineup. [¶] So in terms of corroboration as it relates to Deandrey Moore, you've got Portia Phifer, J.C. Foster, and Anthony Scott if that was not enough even before then. [¶] Now, given J.C. Foster's portion that's been introduced in this trial as only seven minutes long, I'd like to refresh your recollection in that regard and play that seven-minute clip real briefly. [¶] And stipulate the court reporter need not take notes. [¶] THE COURT: All right (Exhibit 19 was played). [¶] [Prosecutor]: So once again, Deandrey Moore's statement is further corroborated with J.C. Foster. Right after Warren was shot and executed by the defendant, Deandrey went to J.C. Foster's house and told him not only that the defendant shot and murdered him but he actually told him about the story in terms of what happened."

At no time did the defense object to the prosecutor's argument. Rather, defense counsel opted to respond to the argument, arguing that Foster's interview was based on rumors and that the jury could not properly evaluate his credibility because his testimony was read into the record: "The D.A. brought in Foster's testimony. Does Foster's testimony support the D.A.'s or the defense theory? We know that Foster was interviewed on August 20, 2009. [¶] He says Moore came to his door on that interview. He admits in that interview, that statement that he gave in that interview were [sic] based on rumors. He says that Ingram's family is targeting anyone connected. He testifies in court in this courtroom November 14 and 15th, 2011. Doesn't testify in this case. We have to read his testimony in. [¶] You don't get a chance to see his demeanor, his attitude. You've got to go by what the inspector read. Can't consider that because he's not Mr. Foster. But if you want to look or read through his testimony, I imagine that could be something you could do. I submit to you it's a wash because he doesn't give you a proper evaluation. [¶] He says that Moore is not trustworthy. He said that in the testimony that he gave that was read into the record. He says he knows a lot of Erics and Eric killed not far from the crime scene. [*Sic.*] [¶] . . .O.P.D. arrested an Erick Gaines with a K, not a C. [¶] Not my client. It's been conceded there's a lot of Erics out there."

" ' " 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " [Citations.]' (*People v. Abilez* (2007) 41 Cal.4th 472, 494.) 'To preserve a claim of prosecutorial misconduct for appeal, a defendant must object and seek an admonition if an objection and admonition would have cured the harm.' (*People v. Kennedy* (2005) 36 Cal.4th 595, 618, disapproved on another point in *People v. Williams* (2010) 49 Cal.4th, 405, 458-459.) The objection must be made on the same ground upon which the defendant now assigns error. (*People v. Jones* (2003) 29 Cal.4th 1229, 1260.)" (*People v. Redd* (2010) 48 Cal.4th 691, 733-734.)

" A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if ' "an admonition would not have cured the harm caused by the misconduct." ' [Citation.] Finally, the absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request. [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, pp. 820-821, overruled on another ground in Price v. Superior Court (2001) 25 Cal.4th 1046, 1069, fn.13.)

Here, appellant argues defense counsel's failure to object was excused because "there was, in effect, an[] admonition given in the form of CALCRIM No. 319, and its ineffectiveness in forestalling the effect of the prosecutor's misrepresentation of the law is the very basis on which the futility of objection and admonition standards in this case." According to defendant, "[t]he distinction between the use of Foster's statement to the police for purposes only of assessing the credibility of his preliminary hearing testimony,

and not for the truth of the matters asserted in the statement to the police, rests on an exceedingly subtle distinction. If Foster's statement to the police was offered to show what was true and not true in his preliminary hearing testimony, that statement would have little or no[] probative force in that regard unless that statement were assessed as true or false."[7] (Italics omitted.)

Notwithstanding this convoluted argument, we find no support for the assertion that it would have been futile to interpose objections and request that the jury be admonished regarding the impermissible use of hearsay. Here, rather than object or request an admonition, defense counsel made the tactical decision to challenge the prosecutor's argument by denigrating Foster's credibility. Accordingly, we conclude defendant forfeited the issue on appeal.

Nevertheless, even addressing the merits, we find nothing in the prosecutor's conduct that was so egregious that infected the trial with such unfairness as to constitute a denial of due process. (*People v. Redd, supra,* 48 Cal.4th at pp. 733-734.) We further conclude that the prosecutor's argument did not deprive defendant rights to confrontation.

## D. *Cumulative Error*

Finally, defendant contends that cumulative effect of the instructional error and prosecutorial misconduct resulted in reversible error. Inasmuch as we have found no error, we perforce reject his claim of cumulative error.

### III. DISPOSITION

The judgment is affirmed

---

[7] Defendant further asserts that: "[I]n the preliminary hearing testimony, Foster asserted that Moore telephoned him. In the prior statement, he asserted that Moore came to his house. That Moore telephoned him is false only if it is true that Moore came to his house. More importantly, Foster's prior statement corroborates the truth of his preliminary hearing claim that Moore identified Eric Gaines and the killer [*sic.*] only if [] the prior statement that Moore had done this is true." (Italics omitted.)

                                  _____

                                  REARDON, ACTING P. J.

We concur:

_____

RIVERA, J.

_____

STREETER, J.